SAIED KASHANI, SBN 144805
800 West First Street Suite 400
Los Angeles, California  90012
(213) 625 4320

Attorney for Plaintiff
SHANTIA HASSANSHAHI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANTIA HASSANSHAHI, | ) Case No. _____ |
| | ) |
|     Plaintiff, | ) COMPLAINT FOR DECLARATORY AND |
| | ) INJUNCTIVE RELIEF AND DAMAGES |
|        v. | ) |
| | ) JURY DEMAND |
| DRUG ENFORCEMENT ADMINISTRATION | ) |
| and MICHELE LEONHART, in her | ) |
| official capacity as DEA | ) |
| Administrator; FEDERAL BUREAU | ) |
| OF INVESTIGATION and JAMES | ) |
| COMEY, in his official capacity | ) |
| as its Director; DEPARTMENT OF | ) |
| JUSTICE and LORETTA LYNCH, in | ) |
| her official capacity as | ) |
| Attorney General; DEPARTMENT OF | ) |
| HOMELAND SECURITY and JEH | ) |
| JOHNSON, in his official | ) |
| capacity as Secretary; the | ) |
| UNITED STATES OF AMERICA; and | ) |
| DOES 1-100, | ) |
| | ) |
|     Defendants. | ) |

**PRELIMINARY STATEMENT**

1.    This program challenges and seeks damages for a 30-year secret federal government program of untargeted, suspicionless and unlawful surveillance of Americans.

2.    Plaintiff SHANTIA HASSANSHAHI, a United States citizen residing in Los Angeles County, California, brings this complaint for the longstanding, secret, unlawful and unconstitutional gathering of his telephony information that was part of a secret mass accumulation, through unlawful means, of telephony information of virtually all American citizens over almost 30 years.  The program was so secret and so well-concealed that, while the government admitted the existence and reach of the program on January 15, 2015, Mr. Hassanshahi is the first and apparently only American who can conclusively prove that his personal telephony information was unlawfully gathered. The instant program is separate and apart from the National Security Agency (NSA) mass surveillance program that was first disclosed by the runaway Edward Snowden (herein referred to as the NSA or "Snowden" program).  Indeed the instant program has been carried out for almost a decade longer and has *fewer* or *no* legal constraints of any kind, unlike the NSA program.

2.    For purposes of full disclosure, Mr. Hassanshahi was convicted of a felony (export law violation) as a result of the unlawful telephony program.  Mr. Hassanshahi entered into a plea agreement under which the government refused to allow him to

1

appeal his conviction on any basis.  Mr. Hassanshahi was sentenced to a term of 12 months and one day and will shortly self-surrender to serve his term.  Notwithstanding, Mr. Hassanshahi is uniquely situated to bring this challenge to the telephony program because he alone can prove, without any further discovery or investigation, that his telephony data was accumulated as part of the mass program.

3.   Specifically, this lawsuit challenges the bulk collection, through unlawful means and violation of specific statute, retention, search, use and dissemination of Americans' telephone records by the Drug Enforcement Administration (DEA) and, on information and belief, by the other defendants.  The untargeted call record surveillance program (the "Mass Surveillance Program" or the "Program") indiscriminately swept (and possibly still sweeps) in the call records of millions of Americans communicating by telephone with what appears to be virtually all foreign countries (herein "overseas calls").  The program was carried out over a period of some 30 years and may be ongoing.

4.   The Mass Surveillance Program was (and potentially still is) a violation of statute and violated the First and Fourth Amendments to the Constitution.

**JURISDICTION, VENUE, STANDING and LIMITATION OF ACTIONS**

5.   This case arises under the Constitution and laws of the United States and presents a federal question within this

court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331.  The Court also has jurisdiction under 5 U.S.C. § 702 and 28 U.S.C. §§ 2201-2202.

6.    Defendants have sufficient contacts with this district generally and operated the Mass Surveillance Program with reference to this district, in the person of plaintiff the record of whose telephone call made while he was in this district was collected as part of the Program.

7.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(B).

8.    Plaintiff has standing because, alone among Americans, defendants conceded that they had collected plaintiff's telephony record as part of the Program, made, retained and searched his record as part of the Program, and utilized his record against plaintiff in a criminal prosecution.  Plaintiff was damaged through the unlawful collection of his telephony information, in presumed damages in excess of $75,000 or according to proof.  Said damages are apart from the criminal case and conviction which was the direct result of the Program.

9.    On January 15, 2015, pursuant to court order sought and obtained by Mr. Hassanshahi, defendants revealed the existence of the Mass Surveillance Program for the very first time by means of a redacted affidavit filed in federal court in Washington DC.  This lawsuit is filed within a two-year statutory period from that date.  (January 14, 2017 fell on a

Saturday, and this complaint is filed the first open court day following January 14).

**PARTIES**

10.   Plaintiff is a United States citizen and resident of Los Angeles County, California.  On September 11, 2013, plaintiff was charged with violation of the federal export laws. On January 15, 2015, pursuant to court order, defendants admitted the existence of the Program subject of this complaint in the course of Mr. Hassanshahi's criminal case.

11.   Defendant DEA is a federal law enforcement agency under the direction and control of the Department of Justice. It is charged with enforcement of the Controlled Substances Act. It is the primary agency carrying out the Mass Surveillance Program and has done so since approximately 1993.  On information and belief, the DEA also participated in the active concealment of the Program through the creation and use of false tips and otherwise disguising the fact that the Program was the source of information utilized in various criminal investigations.

12. Defendant Michele Leonhart is the Administrator of DEA, in office since November 2007. Administrator Leonhart has ultimate authority over DEA's activities.

13. Defendant Federal Bureau of Investigation ("FBI") is a federal law enforcement agency under the direction and control of the Department of Justice.  FBI searches, uses, disseminates, and retains information obtained through the Mass Surveillance

4

Program. That information may still remain in whole or in part in FBI data repositories.

14. Defendant James Comey is the Director of FBI, in office since September 2013. Director Comey has ultimate authority over FBI's activities.

15. Defendant Department of Justice ("DOJ") is a Cabinet-level executive department in the United States government charged with law enforcement, defending the interests of the United States according to the law, and ensuring fair and impartial administration of justice for all Americans. DEA and FBI are components of DOJ.

16. Defendant Loretta Lynch is the Attorney General of the United States, in office since April 2015. Attorney General Holder has ultimate authority over DOJ's activities and those of its components, DEA and FBI.

17. Defendant Department of Homeland Security ("DHS") is a Cabinet level executive department in the United States government charged with ensuring the security of the nation against terrorism and other hazards. DHS searches, uses, disseminates, and retains information obtained through the Mass Surveillance Program. That information remains in DHS data repositories.

18. Defendant Jeh Johnson is the Secretary of Homeland Security, in office since December 2013. Secretary Johnson has ultimate authority over DHS's activities.

5

19. Defendant United States is the United States of America, its departments, agencies, and entities.

20. Defendants Does 1-100 are persons, officers, officials, or entities who have authorized or participated in the Mass Surveillance Program. Plaintiff will allege their true names and capacities when ascertained.

21. Each Defendant is responsible in some manner for the alleged occurrences, and the injuries to Plaintiff were proximately caused by the acts or omissions of the named Defendants, as well as Does 1-100.

**FACTS**

**A.     Background and disclosure of the program**

22.   The Mass Surveillance Program is a program of untargeted and suspicionless surveillance of Americans' telephone records and information ("telephony").

23.   The Program consists of Defendants' bulk collection, retention, search, use, and dissemination of call records for all, or substantially all, telephone calls originating in the United States and terminating in the Designated Countries.  The Mass Surveillance Program maintains information about millions of calls made by Americans, including Plaintiff Hassanshahi.

24. The information collected and made part of a searchable database as part of the Mass Surveillance Program included and includes: the initiating telephone number; the receiving

telephone number; the date, time, and duration of call; and the method by which the call was billed.

25.   On information and belief, since 1993 (the passage of the statute DEA wrongly utilized as authority for the program), DEA has routinely and monthly issued subpoenas to American telecommunications service providers, requiring the providers to turn over information in bulk about Americans' calls to the Designated Countries.  Call records were obtained without any particularized suspicion of wrongdoing, and the Program was not subject to any judicial oversight or authorization.

26.      The Mass Surveillance Program was carried out in secret for years.  From its inception until January 15, 2015, the Program was never disclosed to the public, nor was it disclosed in any criminal proceedings.  By contrast, on information and belief, defendants disguised the existence of the program even from law enforcement personnel.  For example, defendants might utilize the program to identify certain activity, but then claim the information came from undisclosed informants, so as to disguise the true nature of the program.

27.   In a January 15, 2015 filing in *United States v. Hassanshahi*, No. 13-CR-274 (RC), (D.D.C), made only after repeated motions by plaintiff and court order, Defendants disclosed the existence of the Mass Surveillance Program for the first time.  It was described in the Declaration of Robert Patterson.

28.  According to the Patterson Declaration, Defendants obtained call records for the Mass Surveillance Program under 21 U.S.C. § 876.  This statute only authorizes the Attorney General to issue subpoenas for the production of "any records (including books, records, papers, documents, and other tangible things which constitute or contain evidence) which the Attorney General finds relevant or material to [an] investigation [relating to the enforcement of the Controlled Substances Act]."  As explained in more detail below, the referenced statute in no way authorizes or permits the operation of the Program, and the issuance of subpoenas to collect the telephony information was in direct violation of the statute.

29.  The Mass Surveillance Program indiscriminately sweeps in call records for calls between the United States and countries that are determined to have a "demonstrated nexus to international drug trafficking and related criminal activities." Patterson Decl., ¶ 4.  On information and belief, and given the breadth of the definition, virtually every foreign country comes under the definition.  Thus, the Program collected call records for every call made to or from an American from or to abroad during the years of its operation.

30.  DEA has acknowledged that Americans' calls to and from one country—Iran—are included in the Mass Surveillance Program. Patterson Decl., ¶ 4.  Whatever its faults, Iran is not generally recognized as a "nexus" of drug trafficking.  That

Iran would fit under the Program definition, means that virtually all foreign countries would fit under the definition.

31.   Pursuant to section 706(1) of the Foreign Relations Authorization Act (P.L. 107-228), 22 U.S.C. § 2291j-1(1), the President is required to annually certify countries that are major drug transit and/or major illicit drug producing countries. Since at least 2010, the President has annually certified the following countries as such: Afghanistan, The Bahamas, Bolivia, Burma, Colombia, Costa Rica, Dominican Republic, Ecuador, Guatemala, Haiti, Honduras, India, Jamaica, Laos, Mexico, Nicaragua, Pakistan, Panama, Peru, and Venezuela. *See* Presidential Determination on Major Drug Transit or Major Illicit Drug Producing Countries for Fiscal Year 2014, 78 FR 58855, 2013 WL 5325618 (Sep. 13, 2013).

32.   Each of these countries is a focus of DEA activity. For example, DEA has 11 offices in Mexico alone; two offices in Colombia; and two offices in Ecuador. DEA has at least one office in each of the following countries:  Afghanistan, Burma, Costa Rica, Dominican Republic, Guatemala, Haiti, Honduras, India, Jamaica, Laos, Nicaragua, Pakistan, Panama, Peru, and Venezuela.

33.   Given these facts, on information and belief, the Program swept in calls to and from the above countries and virtually all other countries.  Under the Program definition,

virtually every country in the world qualifies as having some "nexus" to drug trafficking.

34.   In addition, given how the program worked technically (see below), it would be difficult to *exclude* any countries from the sweep, and much less complex to simply include all calls to and from outside the United States.

35.   The telephone communications information Defendants collect through the Mass Surveillance Program is retained and stored by Defendants in one or more databases. These databases contain call information for millions of Americans' calls to the Designated Countries.

35.   These databases are then searched not only by officers and employees of DEA, but by the officers and employees of DHS, FBI, and Does 1-100. For example, in the *Hassanshahi* case, the search of the Program database(s) was not performed by DEA. Instead, Homeland Security Investigations, an investigative arm of DHS, accessed and searched the Program database(s).

36.   Use of the Program database(s) is not limited to investigations of illegal drug trafficking or production. Instead, agencies search the database(s) for any purpose (including, but not limited to, investigatory purposes), regardless of the investigation's connection to illegal drugs. For example, in the *Hassanshahi* case, DHS employees searched the Program database—and used and disseminated information obtained from that search—during an investigation of possible

violations of export and trade laws.

37.   According to the Patterson Declaration, the Program was "suspended" after 2013 -- apparently after defendant Hassanshahi was apprehended and began seeking information (see below). Further, according to the Patterson Declaration, the Mass Surveillance Program database is no longer being queried for "investigatory purposes" and "information is no longer being collected in bulk pursuant to 21 U.S.C. § 876." Patterson Decl., ¶ 6.   On information and belief, Defendants continue to use and disseminate information obtained through the Mass Surveillance Program.   Defendants have not stated that all information obtained through the Mass Surveillance Program, including plaintiff's information, has been purged from Defendants' systems.   For example, even if the underlying database has been purged or deleted, information and queries output from the database still exist and reside in individual officer's files and records.

38. Additionally, Defendants could resume bulk collection under 21 U.S.C. § 876 at any time. Defendants may still be collecting call record information in bulk under other authorities.

B.   How the program worked and violated Americans' rights

39.   Defendants exploited and violated 21 USC § 786 to create, maintain and utilize the Program.   21 USC § 786 provides:

11

> In any investigation relating to his
> functions under this subchapter with respect
> to controlled substances, listed chemicals,
> tableting machines, or encapsulating
> machines, the Attorney General may . .
> .require the production of any records
> (including books, papers, documents, and
> other tangible things which constitute or
> contain evidence) which the Attorney General
> finds relevant or material to the
> investigation.

40.   The statute certainly allowed the issuance of administrative subpoenas as such.  But the statute confined the administrative subpoena to controlled substances (drug enforcement) *and also* to an *investigation* concerning controlled substances.  In context this can only mean a *specific* investigation (Code uses the phrases "in any investigation... material to *the* investigation").  Thus the statute allowed the issuance of a given administrative subpoena to get specific information regarding controlled substances in connection with a specific investigation.  The statute did not allow the issuance of generalized subpoenas for the widespread gathering information with no connection to a specific drug investigation.

41.   In the Mass Surveillance Program, defendants secretly and systematically violated every aspect of the statute. Defendants served administrative subpoenas, not in connection with any particular investigation of controlled substances, but systematically and widely, probably universally.  On information and belief, defendants (specifically defendant DEA) automatically served a subpoena on every telecommunications provider every month, demanding full telephony records, possibly in electronic form.  These subpoenae were not in connection with

any particular investigation, or any investigation at all, as required by statute.  Defendants then assembled the information in a vast database that could be queried, searched and cross-referenced.  Every aspect of the subpoena, response and database was kept secret.  On information and belief, the telecommunications providers were not allowed to challenge or reveal the subpoenae.

42.  The result was a systematic database of telephone records of every call to and from every American to and from abroad.  This is of necessity.  If there were "gaps" in the subpoenae -- for example if the government only served a subpoena on a specific provider from time to time as said provider came up in a specific drug investigation -- there would be large gaps in the telephony data and the resulting database would not work as intended.  The creation, retention and use of the database was also not in accord with the statute.

43.  The government also violated the statute because neither the subpoenae nor the resulting database were confined to drug enforcement.  Defendant Dept. of Justice, for example, conceded the Hassanshahi case had nothing to do with drugs, but the database was obviously freely accessible to the agents in charge.  Defendants must have known of the unrestricted use of the database while serving the administrative subpoenae (at some point it became obvious that the database was being used for non-drug investigations, but government continued gathering the telephony records).  Thus both in *gathering* and *disseminating* the data, government engaged in a systematic statutory violation.

45.   On information and belief, the database was not even confined to the investigation of criminal activity but could have been, and probably was, used for more routine surveillance and to detect when given activity *might* be taking place, or perhaps activity that was merely private and not criminal at all.

46.   As confirmed by the Patterson affidavit and other affidavits in the Hassanshahi case, defendants would secretly "query" the database more or less at will.  No search warrant or court permission was required, and normally the fact of the search was never disclosed to anyone.  On information and belief, there were no controls on the use of the database whatsoever.  In principle an agent could query the database without connection to any criminal investigation at all, or out of idle curiosity, or to obtain private information on an American citizen.

47.   A "query" consists of inputting a given telephone number (say, the number of a known criminal *or* a casino, or the local police or perhaps a crisis or domestic abuse hotline, or fertility clinic abroad, or physician specializing in cancer treatments not available in the United States).  The database then returns a list of all telephone calls placed to or from the "queried" number including number, time and date of call, and duration of call.  It is then a simple matter for defendants to "reverse look-up" the telephone numbers on the list and find out who was calling the queried number.  The Program and database were, necessarily, not confined to calls pertaining to criminal activity, or even business calls.  The Program collected data on

14

*all* calls, however personal or intimate.

49.   The database permitted and, on information and belief, was utilized for the most searching analysis not only of individual calls but patterns.  For example, on information and belief, defendants could and did utilize algorithms to track Americans who changed their telephone number for privacy reasons, by monitoring the pattern and origin of calls placed to the old and new number.  For example, if a known number receives calls routinely from a number of telephone numbers, and thereafter a new number receives the same pattern of calls, the algorithm can conclude the new number belongs to the same person as the old number.  The *pervasive* nature of the Program makes escape from its reach impossible even for those who change the numbers for privacy reasons.

50.   The amount of private information discernible from the database is staggering, even without recording the contents of the calls.  First, the telephone number alone is, in most cases, more than enough to identify the caller/recipient of the call through reverse-name-look-up.  Even in the case of a truly "unlisted" number or anonymous phone, algorithms can identify the caller/recipient through the pattern of identifiable numbers that place or receive calls to/from the number in question. Names and identities of friends and relatives abroad is the least of it.  Those seeking medical treatment abroad, or consulting legal help abroad, or seeking to move abroad or back home, are readily identifiable.  A reverse phone number look-up can then reveal the American caller's medical condition or legal difficulty, for example, from the specialty of the professional

consulted.  For example, it is not hard to conclude that an American who repeatedly calls a cosmetic surgeon in India, followed by calls to a hotel in Delhi, followed by calls from Delhi back to his home number in the States, has traveled to Delhi, India for cosmetic surgery at a given clinic.  The database query can then lead to a quick photo of the American at the airport of departure and upon return, discloses the exact cosmetic procedure performed -- the call pattern can easily reveal when the American plans to leave and when she will return.  For more serious violations of privacy, substitute "AIDS clinic" or "cancer treatment center" for "cosmetic surgeon."

51.  It is readily apparent that the use of high-speed computers and algorithms greatly enlarges the scope and detail of private information discernible from the database.  The problem is not just the collection and retention of the information of individual Americans, but the assembly of such information into a searchable database.  And because defendants had and utilized the power to gather the telephony records from all telecommunications providers, the database greatly exceeded the scope of what an individual telecoms provider could even theoretically assemble from its own servers.

51.  On information and belief, in the past when defendants utilized the program, they took steps to disguise its source. For example, defendants might use the program to identify possible criminal activity.  Local agents and law enforcement were then directed to the activity and told the information was based on an "anonymous tip" or "undisclosed informant."  In fact

the source was the Program.

52.   The instant program operates with even fewer controls and oversight than the NSA database whose existence was disclosed by Edward Snowden.   The NSA database, at least, operates under the (loose) supervision of the Foreign Intelligence Surveillance Court or FISA Court.   The NSA database is also, in theory, confined to terrorism or national security cases.   The instant database was not limited in any way, and had no oversight at all, by anyone.   No court anywhere ever approved the program or its creation, maintenance or use, either in the individual case or as a whole.   Very few in government even knew of the existence of the program.   On information and belief, even those agents querying in the program, were not necessarily informed as to the nature or origin of the database.

C.   Discovery of the program

53.   On January 12, 2012, agents of defendant Dept. of Homeland Security detained plaintiff Shantia Hassanshahi at Los Angeles International Airport (LAX) when Mr. Hassanshahi was returning from a trip overseas.   Defendants seized and conducted a forensic examination of Mr. Hassanshahi's computer.   This was not a quick inspection for photographs but a completed, forensic data search and copying of all files and records on the computer.   This search disclosed information implicating Mr. Hassanshahi in an export violation.   In September 2013, Mr. Hassanshahi was arrested and charged with an export violation. United States v. Hassanshahi, 13-CR-274 (D.D.C.).

54.   Defendant Dept. of Justice filed an affidavit in the Hassanshahi case that suggested defendants had decided to detain

17

Mr. Hassanshahi and seize and search his computer on the basis of a query to an undefined telephony database.  Said query revealed that a telephone call had been placed from a number associated with a person under suspicion to a telephone number identified as belonging to Mr. Hassanshahi.  Plaintiff and his counsel believed that this was referring to the NSA database that had recently been disclosed by Edward Snowden.  Government denied this.

55.  Ultimately the district court ordered defendant Dept. of Justice to disclose the nature and details of the database utilized.  On January 15, 2015, government filed the Patterson affidavit, referenced above.  This was the first disclosure of the existence of the program.

56.  The government also disclosed and admitted that defendant Hassanshahi's personal phone records had also been collected and made part of the program.  This is the first and only such admission in the history of the program.  Plaintiff Shantia Hassanshahi is thus the only American who can prove his personal telephone data was collected under the Program, made part of the Program database, and queried as part of the program.

**FIRST CLAIM FOR RELIEF**

**Violation of First Amendment - Declaratory and Injunctive Relief and Damages**

57.  Plaintiff repeats and incorporates by reference the allegations of this Complaint, as if fully set forth herein.

58.  Plaintiff used the telephone to communicate with family members and associates abroad and for other purposes.

59.  By their acts alleged herein, Defendants violated Plaintiff's First Amendment rights including the right to communicate anonymously, the right to associate privately, and the right to advocate free from government interference.

60.  By their acts alleged herein, Defendants have imposed a direct and significant burden on the legal associations and speech of Plaintiff by, among other things, compelling the disclosure of his associations, and eliminating Plaintiff's ability to keep his associations private.  Briefly, every time plaintiff picked up a phone to call or receive a call from overseas, defendants logged the number calling or called and the date, time and duration of the call.  Assembled in a universal database of such calls, and coupled with the ability to reverse look-up phone numbers, this eliminated plaintiff's ability to communicate privately with friends, relatives and associates.

61.  Plaintiff seeks damages in excess of $75,000 for defendants' violation of his First Amendment rights. Plaintiff's damages result from the violation itself and not necessarily or exclusively from the government's use of the data in US v. Hassanshahi.  Plaintiff also seeks an injunction against any further use of the Program and evidence that *all* data associated with the program has been deleted and will not be gathered up again or recovered.

### SECOND CLAIM FOR RELIEF

### Violation of Fourth Amendment - Declaratory and Injunctive Relief and Damages

62.  Plaintiff repeats and incorporates by reference the allegations of this Complaint, as if fully set forth herein.

19

63.  Plaintiff had a reasonable expectation of privacy in his telephone communications information including international calls.

64.  By the acts alleged herein, Defendants violated plaintiff's reasonable expectation of privacy and denied plaintiff his right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the Constitution of the United States.

65.  In particular and without limitation, defendants' use and operation of the program constituted a perpetual "writ of assistance," or general search warrant that allows government officials to search generally (here, *very* generally) for evidence of crime without a specific warrant.  The Program was, in effect, a perpetual general search warrant for any and all international telephone records, to be collected secretly and used at will for, seemingly, any purpose.  This type of general search warrant is specifically forbidden by the Fourth Amendment to the Constitution.  The British use of general warrants allowing customs officials to search anywhere for goods without a specific warrant, helped inspire the Fourth Amendment.

66.  Plaintiff seeks damages in excess of $75,000 and declaratory and injunctive relief according to proof for these violations of his Fourth Amendment rights.

### THIRD CLAIM FOR RELIEF

#### Statutory Violation

67.  Plaintiff repeats and incorporates by reference the allegations of this Complaint, as if fully set forth herein.

68.  In gathering plaintiff's telephony information and

assembling and using the Program, defendants roundly violated the original statute 21 U.S.C. § 876 as alleged above.

69.   Plaintiff is entitled to damages for the statutory violation.

WHEREFORE, plaintiff prays as follows:

A.   For damages according to proof.

B.   For declaratory relief including that the Program was and is a violation of plaintiff's and other Americans' First and Fourth Amendment rights, and a violation of statute.

C.   For injunctive relief including that all traces and data of the program, wherever located, be purged and deleted and proof of same be provided.

D.   For such and further relief as this Court deems proper.

DATED:   January 17, 2017

Saied Kashani
Attorney for Plaintiff
SHANTIA HASSANSHAHI

21

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands trial by jury on every claim and issue triable by jury.

DATED:  January 17, 2017

Saied Kashani
Attorney for Plaintiff
SHANTIA HASSANSHAHI